2026 IL App (2d) 250104
No. 2-25-0104
Opinion filed July 31, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

MILAN T. THOMAS, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable John A. Barsanti, Judge, Presiding.
No. 23-CF-2435

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Birkett and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1 After a jury trial, defendant, Milan T. Thomas, was found guilty of armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2022)) (count I), unlawful use or possession of a weapon by a felon (UPWF) (*id.* § 24-1.1(a)) (count II), and aggravated unlawful use of a firearm without a Firearm Owners Identification (FOID) Card (*id.* § 24-1.6(a)(2), (a)(3)(c)) (count III). The court merged counts II and III into count I and sentenced defendant to a 10-year term of imprisonment. Defendant now appeals, contending that (1) the State failed to prove that he possessed a firearm, (2) he was denied his right to a fair trial due to the State's use of his refusal to consent to a collection of his DNA, and (3) the trial court abused its discretion in sentencing defendant. We affirm.

¶ 2                                   I. BACKGROUND

¶ 3     Defendant was convicted of AHC for the constructive possession of a firearm that was found along the path of his flight from police. Below is a summary of the facts presented at trial by the State through the testimony of five police officers, one expert witness, one homeowner, five videos from officers' bodycams and/or squad cameras, two videos from home surveillance cameras, and multiple stipulations.

¶ 4                               A. Foot Pursuit and Arrest

¶ 5     Aurora police officer Joel Clausing was training Officer Richard McAuliffe on the morning of November 10, 2023. At approximately 3:40 a.m., Clausing noticed a familiar, black Chevrolet Impala driving past with several masked occupants. Clausing testified the Chevy was a vehicle associated with Andres Fonseca, a well-known criminal in Aurora and active member of the Vice Lords street gang. When McAuliffe made a U-turn to follow the Chevy, he noted it had no registration light. The officer turned on the emergency lights and attempted to make a traffic stop.

¶ 6     Instead of stopping, the driver of the Chevy accelerated to speeds of up to 55 miles per hour in a residential neighborhood. When the officers turned on their siren, the driver of the Chevy made a left turn onto Union Street from Spring Street. Both officers testified that the Chevy stopped quickly and then the front-seat passenger exited the vehicle and ran from police. The officers described the individual as wearing a red jacket and black pants. As he ran, Clausing and McAuliffe noted that he was tightly holding onto his waistband with his right hand. This movement led Clausing to believe the individual could be holding a firearm at his waist.

¶ 7     The officers ended their pursuit of the Chevy for public safety reasons, parked, and ran after the fleeing individual. Clausing ran after the individual between the homes at 105 and 107 North Union Street, but lost sight of him when he went behind one of the homes. As many as 10

additional officers responded to the pursuit, including Officer Ryan Frias. After Frias left his squad car behind McAuliffe's vehicle, Frias's squad video recorded an individual running along a six-foot-high privacy fence at 704 Spring Street. Other responding officers reported seeing an individual in a red jacket jumping over multiple fences during the 10-minute pursuit. A K-9 unit and a drone pilot also responded.

¶ 8    Officer Giovanni Conte testified that he pursued the individual until the suspect tripped near the fence at 118 State Street. Multiple officers closed in on the suspect and placed him under arrest. At trial, officers identified defendant as the individual who exited the Chevy and fled through the neighborhood. Defendant was wearing a red jacket and black sweatpants when he was arrested. In his pockets, defendant was carrying a cell phone, two charging cables for cell phones, and a video game controller.

¶ 9    Clausing backtracked the route defendant had taken during the pursuit and discovered a fully loaded Glock 19 handgun in the backyard of 704 Spring Street. Clausing testified that the weapon was dry, sitting on top of foliage, and not covered by leaves. Maria Casas, the homeowner of 704 Spring Street, testified that her yard was fully fenced and that she had let her dog out into the yard at 8 p.m. the previous evening. She stated that there was no weapon in the yard at that time and no one in the home owned a firearm.

¶ 10    Clausing and McAuliffe interviewed defendant following his arrest. Defendant waived his *Miranda* rights and spoke with the officers. See *Miranda v. Arizona*, 384 U.S. 436 (1966). During the interview, defendant refused to voluntarily supply a buccal swab. The State did not pursue a warrant to require the swab for DNA testing. The parties stipulated that the recovered firearm and magazine were processed for fingerprints and swabbed for DNA. No fingerprints were recovered. At trial, Officer Ryan Tinsley, a street-evidence technician, testified that the Illinois State Police

(ISP) lab requires a sample of a victim or the accused for comparison before they will process DNA. The lab did not process the DNA collected from the firearm.

¶ 11                                    B. Pretrial

¶ 12    Defendant was charged with multiple possession-based firearm offenses. On January 4, 2024, the grand jury indicted defendant for the following charges: (1) AHC, (2) UPWF; (3) aggravated unlawful use of a weapon without a FOID card, (4) unlawful possession of a stolen firearm, and (5) unlawful possession of a firearm without a FOID card. The State used defendant's robbery convictions from 2013 and 2016 as predicate offenses for AHC. Before trial, defendant and the State agreed to sever counts III and IV and proceed to trial on only indicted counts I, II, and V. Thus, indictment counts I, II, and V became trial counts I, II, and III.

¶ 13    The parties agreed to two stipulations. First, that defendant had been convicted of two qualifying felony offenses prior to the immediate matter. Second, the firearm and magazine were processed for both fingerprints and DNA, and evidence technician Jimaris Velazquez and Gina Minetti, an expert in latent fingerprint identification, would testify that no latent prints suitable for identification were recovered from the firearm.

¶ 14    Both parties filed motions *in limine* to address the use of defendant's prior convictions. The trial court ruled that if defendant were to testify, the State would be permitted to impeach him with his previous convictions for robbery. The trial court granted defendant's motion to prevent the State from informing the jury that he had an outstanding warrant at the time he was arrested in the immediate matter.

¶ 15    The State prepared edited versions of the bodycam and squad camera videos with audio redactions. Defendant objected to the audio redactions of statements he had made during the arrest, asserting an exception to the hearsay rule. Specifically, defense counsel argued that defendant's

- 4 -

statements were an excited utterance. The State disagreed, noting that the chase had been going on for over 10 minutes before defendant was finally detained. The trial court agreed with the State and ruled that the statements would be inadmissible hearsay.

¶ 16                                    C. Trial

¶ 17    The jury trial began on May 20, 2024. During opening statements, defense counsel referred to the stipulations and emphasized that DNA was collected. Defense counsel told the jury:

> "There is a DNA stipulation, right? We all know how important DNA is these days, the advancements in DNA and technology and being able to link suspects and criminals to crime.
>
> In this case, you will hear evidence that this firearm was swapped [*sic*] in a lot of locations, the top and the bottom of the magazine, the trigger, the slide, the magazine release, the handle, all of these places that you could presumably obtain DNA, especially if someone at some point had it up against their skin in their waistband or had their finger on the trigger or they loaded the magazine. These are all places that hold DNA.
>
> The State will not be able to show [defendant]'s DNA on that firearm, and I want you to ask why. The swabs were taken. You will never hear the results. You will never hear that that DNA was sent to the lab. That DNA, more likely than not, is just sitting in evidence with the police. Why wasn't it sent? That's the evidence you need for proof beyond a reasonable doubt."

¶ 18    The State called multiple officers who were involved in the pursuit and arrest. Additionally, the supervisor for the FOID application processing unit at the ISP, John Strode, testified that defendant did not have a valid FOID at the time of his arrest. The State submitted the redacted videos into evidence, and they were shown to the jury.

¶ 19    To explain the absence of DNA testing, the State elicited related testimony from Clausing and Tinsley. Clausing testified that he had asked defendant to provide a buccal swab and he refused. Tinsley testified that the lab requires a known swab from the accused for comparison before it would run DNA testing.

¶ 20    At the end of live testimony, the State submitted the stipulations that defendant had been previously convicted of two qualifying felony offenses and expert testimony related to the collection of fingerprints and DNA from the firearm.

¶ 21    After the State rested, defendant made a motion for directed verdict. The trial court denied the motion. Defendant chose not to testify. Defense counsel submitted 21 exhibits into evidence, including aerial photos of the path of the foot pursuit and screen captures from the various police bodycam and squad camera videos. The trial court admitted the exhibits and allowed their publication to the jury. Defendant then rested.

¶ 22    After deliberation, the jury found defendant guilty of all three trial counts: AHC, UPWF, and unlawful possession of a firearm without a FOID card.

¶ 23                                    D. Posttrial Motions

¶ 24    Defendant filed a motion for judgment notwithstanding the verdict or a new trial on June 11, 2024. Defendant argued that the trial court had made multiple errors, including in its ruling on the audio redactions of the State's videos. The trial court also erred, argued defendant, in allowing the portion of his post-*Miranda* statement refusing the buccal swab without allowing the remainder of the statement under the completeness doctrine. After reviewing the transcript, the trial court denied the motion.

¶ 25    Defendant filed a *pro se* petition, arguing he was denied effective assistance of counsel. The trial court appointed the Multiple Defendants Division (MDD) to represent defendant for a

*Krankel* hearing. The MDD counsel determined it would not be amending defendant's motion and that they were unable to find any evidence of ineffective assistance. The trial court determined there were no issues of ineffective assistance and returned the case to the public defender for sentencing.

¶ 26                                    E. Sentencing

¶ 27    The trial court held the sentencing hearing on March 6, 2025. The court acknowledged receipt of the presentence investigation report, and the State called two witnesses in aggravation.

¶ 28    Clausing testified to the circumstances of the foot pursuit and defendant's arrest. He testified that he had placed the recovered firearm through the Law Enforcement Agencies Data System and it had been reported stolen in Chicago. Defendant had told Clausing he was running because he used to be a Vice Lord and he thought members of the Latin Kings street gang were chasing him. Defendant also told Clausing that he was intoxicated at the time of the pursuit, but Clausing testified that he had not seen any indication of intoxication.

¶ 29    Clausing also testified to his review of a synopsis of one of defendant's previous convictions. In 2014, defendant was involved in a robbery of a gas station in which he had battered the clerk with a fire extinguisher. Defendant pled guilty to the robbery in case No. 16-CF-116.

¶ 30    The State also called Adam Miller, an investigator with the Aurora Police Department Special Operations Group with a focus on street gangs. He testified that defendant had admitted to being a Vice Lord in 2009. Miller explained that Vice Lords colors are red and black; the same colors defendant was wearing the night of his arrest. The special operations group created a gang sheet for defendant in 2015 when he was stopped with Fonseca, a known Vice Lords member, while defendant was wearing red and black clothing.

¶ 31 Miller testified that defendant was involved in a 2012 robbery in which the victim was struck in the head with a rock. Defendant was identified by the victim and pled guilty. Miller also testified that defendant and Fonseca were shot at on July 23, 2015, allegedly by members of the Latin Kings street gang. Miller testified that there had not been more recent gang contact sheets created for defendant but explained that defendant was in and out of the Illinois Department of Corrections (IDOC) since 2015 and IDOC does not report to the Aurora Police Department when an inmate has a gang-related incident.

¶ 32 Defendant offered several exhibits in mitigation, including his educational transcript from the Edovo Foundation, letters written by Tamara Williams, Jamaica Williams, and Jazari Coleman-Williams, medical reports from several emergency departments of medical centers, and defendant's financial impact statement. All were admitted without objection. Defendant also offered a statement in allocution that expressed regret for his past actions and noted that he was supporting his two-year-old daughter.

¶ 33 Addressing factors in aggravation, the State highlighted defendant's extensive criminal history, the danger he posed by his conduct, his history of disciplinary actions while in the IDOC, and his refusal to take accountability for his actions. Noting that the mandatory sentencing range was 6 years to 30 years, served at 85%, the State asked for the trial court to sentence defendant to 12 years. The State acknowledged that counts II and III should be merged into count I.

¶ 34 In response, defense counsel argued that defendant did not cause or threaten physical harm and that he had been released from prison and completed parole over five months before the immediate matter. Defendant noted his health concerns, including severe asthma and bipolar disorder. Defendant asked for the minimum sentence of six years.

¶ 35    On March 7, 2025, the trial court sentenced defendant. The court considered multiple factors in aggravation, including defendant's criminal history, the importance of the sentence as a deterrent, and defendant's activities with a street gang. The trial court did not consider that defendant's conduct caused or threatened serious harm, thus discounting that factor raised by the State. In mitigation, the trial court found that defendant's actions did not cause or threaten harm, that defendant did not contemplate that his actions would cause or threaten harm, and that defendant has a minor child. The trial court sentenced defendant to 10 years' imprisonment with credit for time served.

¶ 36    On March 11, 2025, defendant filed a motion to reconsider sentence. He argued that, "[i]n light of the evidence presented to the [trial] [c]ourt, the sentence imposed *** was excessive." More specifically, the sentence was "not in keeping with [his] age, current physical and mental health diagnoses and ongoing need for continued medications, therapy, and care, level of education, and character and attitude." The trial court denied the motion.

¶ 37    This timely appeal followed.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, defendant asserts that (1) the State failed to prove beyond a reasonable doubt that he possessed a firearm, (2) he was denied a fair trial and was unduly prejudiced by the State's use of his refusal to consent to the collection of his DNA as evidence of his guilt, and (3) the trial court abused its discretion in sentencing defendant in partial reliance on evidence of his past gang affiliation. We will address each argument in turn.

¶ 40                               A. Weapon Possession

¶ 41    Defendant initially avers that the State failed to prove that he possessed the firearm beyond a reasonable doubt because no witnesses saw him with a firearm, there was no evidence he entered

the fenced yard in which the weapon was found, and no forensic evidence tied him to the firearm. The State counters that circumstantial evidence established that defendant fled from police while armed and that he threw the firearm into a fenced-in yard during his flight.

¶ 42     In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies whether the evidence is direct or circumstantial and does not allow a reviewing court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). We will not retry a defendant. On review, we must draw all reasonable inferences from the evidence in favor of the State. *People v. Jones*, 2023 IL 127810, ¶ 28. Ultimately, we will reverse a defendant's conviction based upon insufficient evidence only when the evidence is so unreasonable, improbable, or unsatisfactory that there is reasonable doubt as to his guilt. *Id.*; *People v. Garcia*, 2025 IL App (2d) 240449, ¶ 42.

¶ 43     Possession may be actual or constructive. *Jones*, 2023 IL 127810, ¶ 30. In this case, officers found the gun in a yard along defendant's flight path, not on his person, so the State had to prove constructive possession of the firearm. A defendant's proximity to contraband is a factor courts have found relevant when determining constructive possession. See *People v. Wise*, 2021 IL 125392, ¶ 29. Further, proof that a defendant had control over the premises where contraband is located gives rise to an inference of knowledge and possession of that contraband. *Garcia*, 2025 IL App (2d) 240449, ¶ 45. Because knowledge is the mental element of an offense, it is often proved by circumstantial evidence rather than direct proof. *People v. Leib*, 2022 IL 126645, ¶ 37.

¶ 44    In the immediate matter, the evidence showed that defendant was seen running with his right hand holding his waist. Multiple police officers described how defendant appeared to be holding something at his waist, and this action was shown to the jury through surveillance video. While it may be true that defendant did not physically enter the yard himself, and thus did not exercise control over the area, the jury could have found that defendant threw the weapon into the yard as he ran past it. The weapon was found around 4 a.m. in a fenced backyard, dry and on top of leaves. The homeowner testified that the weapon was not in the backyard when she let her dog out the previous evening and that there were no firearms in the home. It is true that the State did not present forensic evidence directly tying defendant to the firearm, but this is not a requirement of constructive possession. Viewing the evidence in the light most favorable to the State, this evidence was sufficient for the trier of fact to find beyond a reasonable doubt that defendant had constructive possession of the firearm.

¶ 45                    B. Defendant's Refusal to Consent to DNA Collection

¶ 46    Defendant next argues that he was denied a fair trial and was unduly prejudiced by the State's use of his refusal to consent to the collection of DNA and eliciting testimony to suggest that the refusal was evidence of his guilt. Defendant noted that his trial counsel did not immediately object to the error but argues it should be reviewed under the plain-error doctrine. The State counters that defendant invited the error and would fail the first prong of the plain-error doctrine. We observe that defendant's DNA profile should already be in the police DNA database and, if not, the State could have requested a buccal swab pursuant to Illinois Supreme Court Rule 413(a)(vii) (eff. July 1, 1982) (Disclosure to Prosecution).

¶ 47    The United States Supreme Court has repeatedly held that the government may not use a defendant's assertion of his fifth amendment rights as evidence of guilt. See *Doyle v. Ohio*, 426

U.S. 610, 618 (1976) (finding that it would be "fundamentally unfair and a deprivation of due process to allow" the government to use post-arrest silence to impeach a theory of defense later testified to at trial); *Griffin v. California*, 380 U.S. 609, 615 (1965) (finding that the fifth amendment "forbids either comment by the prosecution on the accused's [decision to not testify at trial] or instructions by the court that such silence is evidence of guilt"); see also Ill. S. Ct. R. 431(b) (eff. July 1, 2012) ("The court shall ask each potential juror *** whether that juror understands and accepts *** that if a defendant does not testify it cannot be held against him or her ***."). The principles underlying the protections afforded defendants asserting fifth amendment rights have also been applied to defendants in the context of the fourth amendment. Illinois courts have consistently held that a defendant is denied a fair trial when their exercise of the right to be free from search and seizures is admitted into evidence. See *People v. Ealy*, 2015 IL App (2d) 131106, ¶ 51. In *Ealy*, the State introduced evidence that the defendant refused to give a DNA sample to the police. *Id.* ¶ 13. On appeal, we found that the admission of that evidence denied the defendant the right to a fair trial. *Id.* ¶ 51. We reasoned, "[t]he State may not introduce evidence that the accused exercised his constitutional right to be free from unreasonable searches and seizures, because the prejudicial effect substantially outweighs the probative value of allowing the jury to infer the accused's consciousness of guilt from his exercise of his rights." *Id.*

¶ 48                              1. Plain Error

¶ 49    We begin our analysis with the plain-error doctrine. When a defendant has failed to preserve an error for appeal, a reviewing court may review the issue for plain error. *People v. Bush*, 2023 IL 128747, ¶ 71; *People v. Rollins*, 2024 IL App (2d) 230372, ¶ 16; Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Plain-error review is appropriate when a clear or obvious error occurs and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against

the defendant, regardless of the seriousness of the error" or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Bush*, 2023 IL 128747, ¶ 71. Under either prong of the plain-error doctrine, the first step in a plain-error analysis is to determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "Under both prongs of the plain-error doctrine, the defendant bears the burden of persuasion." *People v. Russell*, 2022 IL App (2d) 190733, ¶ 44 (citing *People v. Hillier*, 237 Ill. 2d 539, 545 (2010)); *People v. Watkins-Romaine*, 2025 IL 130618, ¶ 28.

¶ 50    Defendant asserts that this court may review this issue under the first prong of the plain-error doctrine. However, the State argues that defendant invited the error and plain-error review is forfeited when the defendant invites the error. See *People v. Patrick*, 233 Ill. 2d 62, 77 (2009) (declining to address the defendant's plain-error claim because he invited any error by submitting the challenged jury instruction); *People v. Villarreal*, 198 Ill. 2d 209, 228 (2001).

¶ 51                                    2. Invited Error

¶ 52    The doctrine of invited error or acquiescence is a form of procedural default or estoppel. *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 24. It is "well established that 'an accused may not ask the trial court to proceed in a certain manner and then contend in a court of review that the order which he obtained was in error.' " *People v. Segoviano*, 189 Ill. 2d 228, 241 (2000) (quoting *People v. Lowe*, 153 Ill. 2d 195, 199 (1992)); see *People v. Williams*, 2022 IL App (2d) 200455, ¶ 53. The rationale for the doctrine is that it would be unfair to grant a party relief based on errors that they introduced into the proceedings. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33. And where a defendant has invited or acquiesced to the

error, we decline to review any related plain-error claim. *People v. Hernandez-Chirinos*, 2024 IL App (2d) 230125, ¶ 76.

¶ 53 Here, the transcript shows that defense counsel made the absence of DNA evidence a cornerstone of the defense. During opening statements, defense counsel told the jury:

> "The State will not be able to show [defendant]'s DNA on that firearm, and I want you to ask why. The swabs were taken. You will never hear the results. You will never hear that that DNA was sent to the lab. That DNA, more likely than not, is just sitting in evidence with the police. Why wasn't it sent? That's the evidence you need for proof beyond a reasonable doubt."

Clausing testified that he "asked if [defendant] would be willing to provide" a buccal swab to "prove or show that the gun was not his and his DNA wouldn't be on it." Defendant chose not to volunteer a buccal swab, as was his right. During closing arguments, the State emphasized that the DNA swabs collected from the gun "weren't sent to the Lab because they did not send a known suspect's DNA swab with that. That's the Lab's fault. The Lab won't take that." Normally, it would have been improper for the State to have introduced defendant's refusal into evidence. In the immediate matter, however, defendant opened the door wide and hung a lantern on it. In the opening statement, defense counsel claimed that DNA evidence was *required* to convict defendant. The State was permitted to respond to the issue by explaining why collected DNA was not tested. We determine that defense counsel invited this error and cannot now receive relief for it.

¶ 54                                   3. Ineffective Assistance of Counsel

¶ 55 In the alternative, defendant argues that he was denied effective assistance of counsel when trial counsel failed to object to testimony regarding defendant's refusal to submit to a buccal swab for DNA comparison.

¶ 56    The right to counsel is, in effect, the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 (1970); *People v. Rogers*, 2021 IL 126163, ¶ 23. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To succeed in his claim, defendant must show two things: that the performance of his counsel was deficient and that he was prejudiced by such deficiency. *Id.* at 694. In *People v. Albanese*, our supreme court adopted *Strickland*, noting specifically that a court can dispose of a claim of ineffective assistance of counsel for a lack of sufficient prejudice without determining if such counsel was deficient. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). Even if a trial strategy did not result in an outcome favorable to the defendant, we "must make every effort to eliminate 'the distorting effects of hindsight.' " *People v. Peterson*, 2017 IL 120331, ¶ 88 (quoting *Strickland*, 466 U.S. at 689). "There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ***." *People v. Miller*, 346 Ill. App. 3d 972, 982 (2004) (citing *Strickland*, 466 U.S. at 689).

¶ 57    It is clear from the record that defense counsel's treatment of the buccal swab testimony could have been trial strategy. As noted above, defense counsel made the absence of DNA evidence a key part of their opening argument. Defense counsel challenged the jury to consider why the State failed to submit DNA for testing to prove their case. The trial court had ruled on a motion *in limine* to allow the State to use one of defendant's additional robbery convictions to impeach him if he were to testify. When the State solicited testimony about defendant's refusal to consent to a buccal swab, defense counsel sought admission of a larger section of the post-*Miranda* interview. As the State points out, defense counsel was likely seeking to present the circumstances

surrounding that portion of the interview rather than to simply object and leave the refusal without context. This was a way for defense counsel to attempt to bring in purported false statements made by the officers immediately before defendant's refusal without the need for defendant to testify. We conclude that defendant has failed to demonstrate that his trial counsel's decision to not object to the testimony was "not within the realm of trial strategy." *People v. Perry*, 224 Ill. 2d 312, 355 (2007).

¶ 58                                    C. Sentencing

¶ 59    Finally, defendant argues that the trial court abused its discretion when it sentenced him to 10 years' imprisonment. Specifically, defendant argues that the trial court abused its discretion in finding that the offense was related to the activities of an organized gang and thus a factor in aggravation. See 730 ILCS 5/5-5-3.2(a)(15) (West 2022). The State argues that defendant forfeited this argument by failing to preserve it in his motion to reconsider sentence. Defendant disagrees, averring that defense counsel had objected to the testimony and argued in the motion to reconsider sentence that the sentence was excessive in "light of the evidence presented to the Court."

¶ 60                                    1. Forfeiture

¶ 61    We will begin with the question of forfeiture. "Failure to raise claims of error before the trial court denies the court the opportunity to correct the error immediately and grant a new trial if one is warranted, wasting time and judicial resources." *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009) (citing *People v. Enoch*, 122 Ill. 2d 176, 185-87 (1988)). To preserve a sentencing issue for appeal, the defendant must make a contemporaneous objection at the sentencing hearing and raise the issue in a postsentencing motion. *People v. Bannister*, 232 Ill. 2d 52, 76 (2008); *People v. Teper*, 2016 IL App (2d) 160063, ¶ 43. Failure to do either of the two requirements may result in

forfeiture of that issue on appeal. *Bannister*, 232 Ill. 2d at 76; *Enoch*, 122 Ill. 2d at 186; *Teper*, 2016 IL App (2d) 160063, ¶ 43.

¶ 62 Defendant notes that his trial counsel argued his sentence was excessive in light of the evidence presented, but this was a broad reference to *all* evidence presented at the sentencing hearing. Trial counsel did not argue the trial court abused its discretion in finding that the offense was related to the activities of an organized gang. The passing reference to defendant's "level of education, and character and attitude" was vague and lacked the specificity required to claim that the trial court abused its discretion in a particular finding of a factor in aggravation. See *People v. Lenz*, 2019 IL App (2d) 180124, ¶ 79. Defendant's motion to reconsider failed to challenge the trial court's findings of factors in aggravation. We agree with the State that this issue was forfeited.

¶ 63 However, we note that the rule of forfeiture is a limitation on the parties and not on the jurisdiction of the reviewing court, and we may overlook forfeiture if it is necessary to obtain a just result. *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 15. The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in certain circumstances. *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 74. Regardless of forfeiture, defendant's claim fails because, as the following will show, there was no error. See *Bannister*, 232 Ill. 2d at 65 (noting that the first step in a plain-error analysis is to determine whether error occurred at all, because, if there was no error, there can be no plain error).

¶ 64                                    2. Finding of Gang Involvement

¶ 65 As noted previously, the first step of plain-error review is determining whether the trial court erred. *People v. Spears*, 2024 IL App (1st) 181491, ¶ 211. It is well established that the ordinary rules of evidence are relaxed during sentencing hearings. *People v. Varghese*, 391 Ill. App. 3d 866, 873 (2009). Evidence may be admitted so long as it is both relevant and reliable. *People*

*v. Harris*, 375 Ill. App. 3d 398, 409 (2007). The source and type of admissible information is virtually without limits. *People v. Brooks*, 2021 IL App (4th) 200573, ¶ 52. A court " ' "may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense." ' " *People v. La Pointe*, 88 Ill. 2d 482, 495 (1981) (quoting *People v. Adkins*, 41 Ill. 2d 297, 300-01 (1968), quoting *People v. McWilliams*, 348 Ill. 333, 336 (1932)). Specifically, a court may inquire into a defendant's "general moral character, habits, social environment, abnormal tendencies, age, natural inclination or aversion to commit crime, and stimuli motivating his conduct, in addition to his family life, occupation, and criminal record." *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007). It may also consider a defendant's "criminal conduct not resulting in prosecution or conviction." *Harris*, 375 Ill. App. 3d at 409.

¶ 66    It was not clear or obvious error for the trial court to find that the offense was related to the activities of an organized gang. See *People v. Williams*, 2015 IL App (2d) 130585, ¶ 11. Miller and Clausing testified to a wide range of factors that could have led the trial court to reach this conclusion. Defendant admitted to being a member of the Vice Lords in 2009. In 2015, defendant was pulled over in a vehicle with Fonseca, a known Vice Lords member, and defendant was wearing red and black, Vice Lords colors. Defendant and Fonseca were together at defendant's home in 2015 when members of the Latin Kings fired upon them. Miller testified that defendant was classified as an inactive gang member but explained that this classification only signifies that he had not received a new gang contact sheet since his release from prison a year prior. A new gang contact sheet was created after defendant's arrest in the immediate matter. Here, Clausing testified he recognized the car as one used by Fonseca since he had stopped Fonseca in that vehicle two weeks earlier. Defendant was in Fonseca's car at 3:40 am with multiple other occupants, some reportedly wearing masks. When defendant was apprehended, he was once again wearing gang

colors. We find that the trial court did not commit clear or obvious error in finding the offense related to the activities of an organized gang.

¶ 67                                    3. Sentence

¶ 68    Defendant finally argues that his "sentence should be vacated and the case remanded for a new sentencing hearing without this improper evidence and consideration by this court or his sentence should be reduced to six years." We decline to vacate the sentence but will consider this request to reduce the sentence. See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). Defendant argues that the 10-year prison sentence was excessive, given (1) the nature of the offense, (2) the age of his prior criminal history, (3) his family support, and (4) the fact that he has a young child.

¶ 69    The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A trial court has broad discretion in imposing a sentence. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A sentence that falls within the statutory range should only be reversed when the court has abused that discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A trial court abuses its discretion when the penalty imposed is "greatly at variance with the spirit and purpose of the law, or is manifestly disproportionate to the crime." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 49. A trial court has wide latitude in sentencing as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *People v. McGee*, 2020 IL App (2d) 180998, ¶ 8. It is the trial court's responsibility to balance the relevant factors to make a reasonable decision, and it is not for a reviewing court to reweigh such factors.

*People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Generally, a sentence falling within the statutory range will be presumed to be proper. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 53.

¶ 70     While we ordinarily review with great deference the trial court's choice of sentencing within the applicable guidelines, the question of whether the trial court relied on an improper factor in imposing the sentence is a question of law, which we review *de novo*. *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 15. Upon review, we may affirm a sentence that the trial court based upon an improper factor if we can determine that the weight placed on the factor was so insignificant that it did not lead to a greater sentence. *People v. Heider*, 231 Ill. 2d 1, 21 (2008).

¶ 71     In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence, and punishment, as well as the defendant's rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the particular circumstances of the case. *Id.* There is a presumption that the trial court considered all relevant factors in determining a sentence. That presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors. *People v. Payne*, 294 Ill. App. 3d 254, 260 (1998).

¶ 72     The trial court addressed the evidence in aggravation in great detail, including defendant's criminal history. The presentence report showed defendant had been adjudicated as delinquent 10 times between the ages of 12 and 17. From the age of 19, defendant had been sentenced to the IDOC on four different occasions. The court found deterrence to be a factor and found that the crime was related to the activities of an organized gang, as noted above. See 730 ILCS 5/5-5-3.2(a)(15) (West 2022). Based upon our *de novo* review, the trial court's finding that the offense was related to the activities of an organized gang was not improper.

¶ 73    Beyond this specific factor in aggravation, we turn briefly to the sentence. The trial court fully reviewed all evidence before it, and on the motion to reconsider, the trial court explicitly stated that it reviewed all relevant factors. As noted, it is not our province to reweigh those factors. The trial court sentenced defendant to a 10-year term, which was less than the State's recommendation of 12 years and substantially less than the maximum allowable sentence of 30 years. We find that the trial court did not abuse its discretion in sentencing defendant.

¶ 74                                III. CONCLUSION

¶ 75    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 76    Affirmed.

*People v. Thomas*, 2026 IL App (2d) 250104

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 23-CF-2435; the Hon. John A. Barsanti, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Toni Lea Heniff, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |